# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

v.

CHRISTOPHER LEMOINE, aka Terry
Giagnoca,
          *Defendant-Appellant.*

No. 06-50663

Central District of
California
D.C. No.
CR-03-00037-RT-01

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

v.

CHRISTOPHER LEMOINE, aka Terry
Giagnoca,
          *Defendant-Appellant.*

No. 07-50083

Central District of
California
D.C. No.
CR-03-00037-RT-01

CHRISTOPHER LEMOINE,
          *Petitioner-Appellee,*

v.

CHARLES A. DANIELS, Federal
Correctional Institution Sheridan,
Oregon,
          *Respondent-Appellant.*

No. 07-35761

District of Oregon
D.C. No.
CV-07-00100-MFM

OPINION

Appeals from the United States District Court
for the Central District of California
Robert J. Timlin, District Judge, Presiding

14363

Appeal from the United States District Court
for the District of Oregon
Malcolm F. Marsh, District Judge, Presiding

Submitted May 9, 2008*

Filed October 9, 2008

Before: Richard C. Tallman and Richard R. Clifton,
Circuit Judges, and Earl H. Carroll,** District Judge.

Opinion by Judge Clifton

---

*The panel unanimously finds this case suitable for decision without oral argument. *See* Fed. R. App. P. 34(a)(2).

**The Honorable Earl H. Carroll, Senior United States District Judge, District of Arizona, sitting by designation.

**COUNSEL**

Christopher W. Lemoine, pro se, as appellant in Nos. 06-50663 & 07-50083 and as appellee in No. 07-35761.

Kelly A. Zusman and Scott E. Asphaug, Assistant United States Attorneys, Portland, Oregon, for appellant United States in No. 07-35761.

Michael J. Raphael and Robert C. Stacy II, Assistant United States Attorneys, Los Angeles, California, for appellee United States in Nos. 06-50663 & 07-50083.

# OPINION

CLIFTON, Circuit Judge:

These consolidated appeals present the question of whether the Bureau of Prisons (BOP), the federal agency responsible for the incarceration of inmates, may require inmates who participate in the bureau's Inmate Financial Responsibility Program (IFRP) to pay restitution to victims at a higher or faster rate than was specified by the sentencing court, without obtaining an order from the sentencing court directing or approving the larger payments. We conclude that the BOP may do so.

## I.  Background

Christopher Lemoine was, after a guilty plea, convicted of one count of wire fraud in violation of 18 U.S.C. § 1343. That proceeding was in the Central District of California. Lemoine was sentenced to imprisonment for 77 months, to serve five years thereafter on supervised release, and to pay restitution in the total amount of $2,835,126.88, pursuant to the Mandatory Victims Restitution Act (MVRA), 18 U.S.C. § 3663A. The Judgment and Probation/Commitment Order entered by the district court required that Lemoine pay restitution during his imprisonment "at the rate of not less than $25 per quarter, and pursuant to the Bureau of Prisons' Inmate Financial Responsibility Program." The order required Lemoine to make "monthly payments of at least $500" while on supervised release.

After he began serving his sentence at the medium security facility operated by the BOP in Sheridan, Oregon, Lemoine enrolled in the IFRP. As a condition of his participation in the program, the BOP required that Lemoine pay restitution at a rate of $132 per month, a dollar figure and a frequency higher than the "not less than $25 per quarter" specified in the court's judgment. Lemoine filed a motion with the sentencing

court, the Central District of California, to modify the judgment. He argued that the court had improperly delegated its authority to schedule restitution payments and raised a series of challenges, relying on *United States v. Gunning*, 339 F.3d 948 (9th Cir. 2003) (*Gunning I*), and *United States v. Gunning*, 401 F.3d 1145, 1150 (9th Cir. 2005) (*Gunning II*).

The district court denied Lemoine's motion, reasoning that "the only duty which the Ninth Circuit has held non-delegable under the MVRA is that of scheduling restitution payments. Here, the court did not delegate scheduling to the BOP. It set the payment schedule as quarterly in its restitution order." [Page 4 of C.D. Cal. Order entered October 20, 2006, which is ER 26 in the Oregon case originally assigned to us.] The court also noted that the phrase "pursuant to the Bureau of Prisons' Inmate Financial Responsibility Program" was included in the judgment because the court assumed "*sub silentio* that the defendant would choose to participate in the voluntary IFRP program" to "qualify for certain benefits and advantages," indicating that the order did not mandate Lemoine's participation and stating that "Lemoine did so choose [to voluntarily participate in the program], agreeing to pay $132.00 per month." The court declined to reach the merits of Lemoine's challenges to the IFRP itself because they were raised in his reply brief and because such challenges are "properly made in a habeas petition under 28 U.S.C. § 2241, and the petition should be filed in the district court in which petitioner's place of incarceration is located." [C.D. Cal. Order, at 6.] Lemoine, acting pro se, filed multiple appeals from the decision of the Central District of California, two of which are before us, Nos. 06-50663 and 07-50083.[1]

_____

[1]The appeals were from the district court's denial of his motion to modify a restitution order (No. 06-50663) and the denial of reconsideration (No. 07-50083). This court granted the government's motion to dismiss another appeal, regarding an extension of time (No. 07-50084) because Lemoine was not aggrieved by that order. Lemoine voluntarily dismissed an appeal from the dismissal of a receiver motion (No. 07-50085).

Shortly after Lemoine's unsuccessful challenge to his sentence, the BOP modified the schedule of restitution payments required from Lemoine under the IFRP, setting it as the minimum amount permitted under Lemoine's sentencing order: $25 per quarter. The record does not make clear the reason for the change. Nonetheless, Lemoine followed the suggestion contained in the order entered by the Central District of California, and in January 2007 filed a pro se § 2241 habeas petition in the District of Oregon, where he was then incarcerated. That court issued an opinion and order on July 20, 2007.

Lemoine's District of Oregon petition presented three challenges. First, he argued that the sentencing order impermissibly delegated authority to the BOP to set his restitution repayment schedule. The Oregon district court said it declined to reach this claim because it was the subject of the direct appeal from the Central District's order and was thus not ripe for collateral attack. Later in the order, though, the Oregon district court seemed to reject this challenge, by stating that "here the sentencing court set a schedule for making restitution payments during incarceration" and therefore "did not unlawfully delegate that authority to the BOP."

Second, Lemoine contended that the IFRP violated the Equal Protection Clause by treating otherwise similarly situated prisoners differently based on whether they had the ability to pay their restitution. The Oregon district court rejected this contention, stating that rational basis review applied because prisoners were not members of a suspect class and the IFRP did not impinge upon any fundamental rights. It held that the IFRP was rationally related to the legitimate governmental purpose of enforcing sentencing orders and ensuring that inmates fulfill their financial obligations to make good the harm they visited upon their victims. The court found that the IFRP furthered this purpose by offering inmates incentives to work and pay their debts during their imprisonment and imposing consequences, within constitutional bounds, for failing to do so. The court's order cited several precedents and

quoted specifically from *Gunning II* and stated that "the Ninth Circuit implicitly endorsed the IFRP" in that decision.

Finally, Lemoine argued that the BOP lacked the authority to increase his restitution repayment rate above the $25 per quarter minimum the sentencing court established in its judgment. The Oregon district court agreed with that challenge. The court held Congress's mandate in the MVRA to be clear: "the sentencing court 'shall . . . specify in the restitution order the manner in which, and the schedule according to which, the restitution is to be paid . . . .' " (citing 18 U.S.C. § 3664(f)(2)). It noted that the Ninth Circuit had interpreted the provision as decisive when it held in *Gunning II* that the "district court must determine the restitution payment schedule." The court concluded that, "[t]hough the Ninth Circuit has not yet considered whether the BOP may increase an inmate's restitution payment amount without a court order, I find that allowing the BOP to modify the payment schedule in any way, without court approval, amounts to an equally impermissible delegation of authority as allowing the BOP to create the payment schedule."

With respect to the potentially voluntary nature of the new payment schedule, the Oregon district court found that Lemoine "agreed" to pay the higher rate only to avoid the adverse consequences of failing to do so. It held that the BOP's modification of Lemoine's restitution payment schedule pursuant to the development of a "financial plan" under the IFRP was in excess of its authority and therefore not in accordance with law, and on that basis granted Lemoine's petition and ordered the BOP to maintain the schedule at $25 per quarter. The government appealed, and that appeal has been assigned No. 07-35761 by our court.

The three pending appeals, Nos. 06-50663 and 07-50083 from the Central District of California, and No. 07-35761 from the District of Oregon, have all been assigned to this panel as related cases. By separate order we have consolidated

the three appeals, and we resolve all three in this opinion. Specifically, we affirm the orders and judgment of the district court for the Central District of California in Nos. 06-50663 and 07-50083, and we reverse the order and judgment of the District of Oregon in No. 07-35761.

## II. Discussion

"We review *de novo* a district court's decision to grant or deny a petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2241." *Khotesouvan v. Morones*, 386 F.3d 1298, 1299 (9th Cir. 2004).

We hold that the BOP's operation of the IFRP does not constitute an unlawful delegation of authority to schedule restitution repayments in violation of the MVRA. The MVRA requires the sentencing court to set a restitution repayment schedule. The sentencing court did that here. The MVRA does not prohibit an inmate from voluntarily making larger or more frequent payments than what was set by the sentencing court. Nor does it limit the authority of the BOP, through the IFRP, to offer incentives to inmates to pay their restitution obligations in larger amounts or at a faster rate than the court has required.[2]

We also reject Lemoine's argument that his participation in

[2]After these appeals were filed and were assigned to this panel, Lemoine was transferred to a Residential Reentry Center (RRC), or halfway house. Although RRCs are independently operated, Lemoine remains in federal custody and subject to the BOP's authority. By contract, the BOP requires its RRCs to "provide for the continuity of the Bureau's institution policy concerning the Inmate Financial Responsibility Program" and mandates that they "establish a program" whereby they monitor an inmate's progress on his or her "financial plan." BOP, Residential Reentry Center Statement of Work, at 48 (Aug. 2007), *at* http://www.bop.gov/locations/cc/res_rentry_ctr_sow_2007.pdf. Thus, Lemoine continues to have standing to challenge the BOP's authority to condition participation in the IFRP on higher restitution payments than required by the sentencing court.

the IFRP was involuntary because he would have been denied certain privileges if he had refused to join the program. Lemoine did not have a preexisting right to receive any of the benefits conditioned on his participation during his incarceration, and the consequences the BOP imposes on inmates who refuse to participate in the IFRP are reasonably related to the legitimate penological interest of rehabilitation. In addition, the consequences are not so severe as to impose an "atypical and significant hardship" and therefore do not infringe on any constitutionally-protected liberty interest. *See Sandin v. Conner*, 515 U.S. 472, 484-85 (1995). The BOP therefore had the authority to create a financial plan for Lemoine through the IFRP and to impose penalties if he failed to accept its terms.

[1] The BOP's IFRP applies to nearly all post-trial inmates in federal facilities. 28 C.F.R. § 545.10. It is intended to "encourage[ ] each sentenced inmate to meet his or her legitimate financial obligations." *Id.* Under the IFRP, "unit staff" develop a financial plan for each inmate and monitor his or her progress in adhering to that plan. 28 C.F.R. § 545.11. In doing so, they conduct an independent assessment of inmates' abilities to pay by reviewing their financial obligations and "all available documentation." 28 C.F.R. § 545.11(a). The IFRP typically requires a minimum payment of $25 per quarter for non-UNICOR and UNICOR grade 5 inmates.[3] 28 C.F.R. § 545.11(b)(1). For inmates in UNICOR grades 1 through 4, the IFRP requires payments of at least 50 percent of the inmate's monthly pay. The BOP may obtain payments from funds earned through prison employment as well as from funds received from outside sources, such as money sent by relatives. 28 C.F.R. § 545.11(b).

[2] An inmate is free to decline to participate in the IFRP, but the failure either to participate or to comply with a finan-

---

[3]UNICOR is the trade name of Federal Prison Industries, Inc., a self-sustaining government corporation that provides employment and job training to BOP inmates while producing marketable goods and services.

cial plan created pursuant to the program carries certain consequences. They are set forth in 28 C.F.R. § 545.11(d):

> (d) Effects of non-participation. Refusal by an inmate to participate in the financial responsibility program or to comply with the provisions of his financial plan ordinarily shall result in the following:
>
>> (1) Where applicable, the Parole Commission will be notified of the inmate's failure to participate;
>>
>> (2) The inmate will not receive any furlough (other than possibly an emergency or medical furlough);
>>
>> (3) The inmate will not receive performance pay above the maintenance pay level, or bonus pay, or vacation pay;
>>
>> (4) The inmate will not be assigned to any work detail outside the secure perimeter of the facility;
>>
>> (5) The inmate will not be placed in UNICOR. Any inmate assigned to UNICOR who fails to make adequate progress on his/her financial plan will be removed from UNICOR, and once removed, may not be placed on a UNICOR waiting list for six months. Any exceptions to this require approval of the Warden;
>>
>> (6) The inmate shall be subject to a monthly commissary spending limitation more stringent than the monthly commissary spending limitation set for all inmates. This more stringent commissary spending limitation

for IFRP refusees shall be at least $25 per
month, excluding purchases of stamps, tele-
phone credits, and, if the inmate is a com-
mon fare participant, Kosher/Halal certified
shelf-stable entrees to the extent that such
purchases are allowable under pertinent
Bureau regulations;

(7) The inmate will be quartered in the low-
est housing status (dormitory, double bunk-
ing, etc.);

(8) The inmate will not be placed in a
community-based program;

(9) The inmate will not receive a release
gratuity unless approved by the Warden;

(10) [Reserved]

(11) The inmate will not receive an incen-
tive for participation in residential drug
treatment programs.

In *Gunning I* and *Gunning II*, we held that, where a sen-
tencing court had ordered restitution pursuant to the MVRA,
the MVRA forbids delegation of the scheduling of restitution
payments. This is because the "language of the MVRA is cat-
egorical," and provides that "the district court is ultimately
responsible for setting a schedule for making restitution."
*Gunning I*, 339 F.3d at 949; *see also* 18 U.S.C.
§ 3664(f)(1)(B)(2) ("Upon determination of the amount of
restitution owed to each victim, the court shall . . . specify in
the restitution order the manner in which, and the schedule
according to which, the restitution is to be paid . . . .").

In *Gunning I*, we rejected a judgment that required the
defendant to make restitution "immediately" with any remain-

ing amount "to be paid during the period of supervision as directed by a U.S. probation officer." 339 F.3d at 950. We held that the district court had erred in delegating to the probation office the duty of scheduling payments. *Id.* On remand, the district court again ordered immediate payment, but provided that any unpaid amount should be paid through the BOP's IFRP during the time of the defendant's imprisonment and in monthly payments of at least 10 percent of his salary during his period of supervised release. *Gunning II*, 401 F.3d at 1147. We recognized that the BOP, like the probation office, had "expertise in the payment area," but held that such expertise did not absolve the district court of fulfilling its responsibility of creating a restitution repayment schedule, including for the period of the defendant's imprisonment. *Id.* at 1150. Although the district court could seek guidance from the BOP when setting its schedule, it did not have "the authority to delegate its own scheduling duties—not to the probation office, not to the BOP, not to anyone else." *Id.*[4]

---

[4]The circuits have split over how to interpret the MVRA and to what extent it permits delegation of restitution scheduling duties. The First, Second, Third, Sixth, Eighth, Tenth, and Eleventh Circuits have all held that a district court must set a restitution repayment schedule, and those that have reached the issue have concluded, as we did in *Gunning II*, that a court may not simply order immediate payment and leave to the BOP the task of setting the actual schedule. *United States v. Merric*, 166 F.3d 406, 409 (1st Cir. 1999); *United States v. Kinlock*, 174 F.3d 297, 301 (2d Cir. 1999) ("When restitution cannot be paid immediately, the sentencing court must set a schedule of payments for the terms of incarceration, supervised release, or probation."); *United States v. Corley*, 500 F.3d 210, 228 (3d Cir. 2007); *United States v. Davis*, 306 F.3d 398, 426 (6th Cir. 2002); *United States v. McGlothlin*, 249 F.3d 783, 785 (8th Cir. 2001); *United States v. Overholt*, 307 F.3d 1231, 1256 (10th Cir. 2002); *United States v. Prouty*, 303 F.3d 1249, 1254-55 (11th Cir. 2002) (holding that "setting a schedule for a prisoner to pay restitution or fines is a core judicial function under the MVRA" and that a sentencing court may not order immediate repayment where funds are unavailable because it implicitly delegates the authority to schedule repayment to the probation office).

In contrast, the Fourth, Fifth, and Seventh Circuits have held that a judgment of conviction need not contain a schedule of restitution pay-

**[3]** While the MVRA forbids the wholesale delegation of scheduling responsibility to the BOP, nothing in the text of the statute or our prior decisions places any limits on the BOP's operation of an independent program, such as the IFRP, that encourages inmates voluntarily to make more generous restitution payments than mandated in their respective judgments. *See* 18 U.S.C. §§ 3663A, 3664. In *Gunning II*, even as we held that the IFRP could not act as a substitute for a court-created restitution schedule, we implicitly endorsed the program's continued viability, praising the BOP for "wisely" creating "the IFRP procedure whereby the BOP will 'help the inmate develop a financial plan' and will then 'monitor the inmate's progress' in meeting the terms of that plan." 401 F.3d at 1150 (quoting 28 C.F.R. § 545.11).

**[4]** Lemoine argues that the program is involuntary and that he only assented to the terms of his financial plan "to avoid the adverse consequences of not agreeing." The use of incentives to encourage compliance in a rehabilitative program does not render it unconstitutional or unlawful, however. *McKune v. Lile*, 536 U.S. 24, 39 (2002) (plurality) ("An essential tool of prison administration . . . is the authority to offer inmates various incentives to behave. The Constitution accords prison officials wide latitude to bestow or revoke these perquisites as they see fit."). In *McKune*, the Supreme Court approved of a prison's imposition of adverse consequences for failing to participate in a program aimed at encouraging acceptance of responsibility, notwithstanding the program's direct impact on inmates' constitutional rights. It

---

ments to be made during the period of incarceration. *United States v. Dawkins*, 202 F.3d 711, 716 (4th Cir. 2000); *United States v. Miller*, 406 F.3d 323 (5th Cir. 2005); *United States v. Sawyer*, 521 F.3d 792, 796 (7th Cir. 2008) (concluding that court ordered payment schedules "need not, and as a rule should not, begin until after the defendant's release from prison," rather "[p]ayments until release should be handled through the Inmate Financial Responsibility Program rather than the court's auspices").

upheld the constitutionality of an incentive system whereby inmates who refused to waive their Fifth Amendment privilege against self-incrimination and admit to past offenses in writing were transferred to another prison where television sets were not present in each cell, exercise facilities were not readily available, work and wage opportunities were more limited, canteen privileges were reduced, and visitation rights were curtailed. *Id.* at 36-39 (plurality), 50-51 (O'Connor, J., concurring in the judgment).

[5] In the present case, our analysis is simplified because the challenged rehabilitative program does not implicate Lemoine's constitutional rights. Lemoine had no entitlement, constitutional or otherwise, to any of the benefits agreeing to participate in the IFRP would provide, such as a work detail outside the prison perimeter, a higher commissary spending limit, a release gratuity, or pay beyond the maintenance pay level.[5] *See* 28 C.F.R. § 545.11(d).

[6] Moreover, the consequences of declining to participate in the IFRP are reasonably related to the legitimate penological interest of rehabilitation because the program promotes acceptance of responsibility and fulfillment of the obligation to make restitution to victims. *See Mauro v. Arpaio*, 188 F.3d 1054, 1059 (9th Cir. 1999) (upholding a prison policy of excluding sexually-explicit materials because it was aimed at rehabilitating inmates, which the court noted was unquestion-

---

[5]We refer to the conditions imposed through the IFRP as granting or denying either benefits or privileges interchangeably because we agree with the plurality in *McKune* that it would be a mistake "to concentrate on the so-called reward/penalty distinction and the illusory baseline against which a change in prison conditions must be measured. The answer to the question whether the government is extending a benefit or taking away a privilege rests entirely in the eye of the beholder." *McKune*, 536 U.S. at 45-46. If the BOP were permitted to encourage behavior by providing benefits and privileges, but not by denying or revoking them, it would create "perverse incentives" to initially house all prisoners under the harshest constitutionally permissible conditions possible. *Id.* at 46.

ably a legitimate penological interest); *see also Pell v. Procunier*, 417 U.S. 817, 823 (1974) (concluding that a "paramount objective of the corrections system is the rehabilitation of those committed to its custody"); *Johnpoll v. Thornburgh*, 898 F.2d 849, 851 (2d Cir. 1990) (holding that, even if the BOP did compel participation in the IFRP, it would still not be unconstitutional because the program was not punitive and was reasonably related to the legitimate governmental objective of rehabilitation).

The consequences for declining to participate in the IFRP also do not constitute such an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" that they invoke Lemoine's liberty interest. *See Sandin*, 515 U.S. at 484-85 (holding that even a "concededly punitive" transfer to less desirable housing conditions did not exceed prison officials' authority because it did "not present a dramatic departure from the basic conditions of [the inmate's] indeterminate sentence"). The imposition of those consequences therefore would not have violated Lemoine's due process rights, and it was within the BOP's discretion to condition the receipt of privileges under the IFRP on his acceptance of the terms of its financial plan. *Ky. Dep't of Corrections v. Thompson*, 490 U.S. 454, 460-61 (1989) ("[A]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight.") (internal quotations omitted); *Montano-Figueroa v. Crabtree*, 162 F.3d 548, 549 (9th Cir. 1998) (noting that the IFRP has been "upheld generally . . . and against constitutional due process challenges" and collecting cases) (internal citations omitted).

[7] Permitting the BOP independently to develop voluntary financial plans through the IFRP not only assists the BOP to meet its rehabilitative goals for prisoners, it also ameliorates the practical difficulties engendered by requiring sentencing

courts to set a restitution repayment schedule without knowledge of whether a defendant will be employed in prison or the amount he will receive in wages or outside assistance. The IFRP allows the BOP to respond immediately to an inmate's changing financial circumstances and saves scarce judicial resources from being consumed by frequent motions to alter judgments.

This is not to say that district courts may not play a continuing role in setting the terms of the mandatory portion of an inmate's restitution repayment schedule. Under the MVRA, defendants have an ongoing duty to inform the court of any "material change in the defendant's economic circumstances that might affect the defendant's ability to pay restitution." 18 U.S.C. § 3664(k). After receiving such notification, the court "may . . . adjust the payment schedule, or require immediate payment in full, as the interests of justice require." *Id.* This process permits courts to raise the binding payment floor in response to particular changes if they desire, while leaving room for the BOP to take full advantage of its institutional expertise and resources to create voluntary, flexible financial plans as evolving conditions dictate.

## III.   Conclusion

**[8]** We hold that, where the district court has properly set a restitution repayment schedule as required under the MVRA, the BOP has the authority to encourage voluntary payments in excess of those required under the court's judgment by conditioning the receipt of certain privileges during the term of imprisonment on the inmate's participation in the IFRP.

The orders of the U.S. District Court for the Central District of California denying Lemoine's motion to modify the restitution order (No. 06-50663) and motion for reconsideration (No. 07-50083) are AFFIRMED.

The order of the U.S. District Court for the District of Oregon granting Lemoine's petition for habeas corpus and directing the BOP to maintain his restitution repayment schedule at $25 per quarter (No. 07-35761) is REVERSED.